• Scott, J., dissenting. Having been unable to coincide with my brother judges in some of their views touching the questions decided in this case, and, especially, disagreeing with them in their conclusions on the main question, the duty of reducing my reasons, for dissenting, to writing, has been devolved upon me by the statute; and, as I shall go at large into the whole subject as it presents itself to my mind, and may be therefore unnecessarily diffuse, my present purpose is to avail myself of the vacation to re-write these views in a more condensed form for the lleporter. I shall first take a rapid glance at our judicial system, as that will enable me, with some brevity, to present my views as to the effect of the recent amendments to the constitution, and will serve to elucidate the few remarks that I intend to make in that connexion. While this system, which the people of this State in their sovereign capacity “ instituted for their peace, safety, and happiness,” amply attests their wisdom and love of civil liberty, it contemplates duties by those functionaries entrusted with its motive power, at once difficult, arduous and responsible. Although a beautiful fabrick, constructed with infinite skill, and, in many of its minutest parts altogether finished, necessarily, from the nature and state of things, it was incomplete as a whole when it passed from their hands. And the duty of giving to it its finishing strokes wras entrusted to agents constituted by the same instrument which presents to us not only this system, but the entire scheme of our State government. So far as this tribunal is concerned, not only is it erected by the constitution, but the qualification and number of the judges, who are to constitute it, are fixed, the duration of their offices respectively ascertained, its powers defined, its territorial jurisdiction made commensurate with the geographical limits of the State, and, in fine, little left undone to make this portion of the system complete, except the exercise by the Legislature of delegated powers in the filling of the offices of the three judges, and in fixing the times and places for the holding of its terms. But, to give effect to those provisions which contemplate the administration of justice in the circuit and county courts, and by justices of the peace, more extensive duties were imposed on the Legislature. Circuits, counties, and townships, were here indispensable prerequisites, and these were, for the most part, to be created by the Legislature, either directly or indirectly, and are all placed by the constitution within the range of legislative discretion to establish, abolish, enlarge, or diminish, as the exigencies of the public convenience might seem to demand, not beyond the constitutional coirfincs of this discretion. As there were counties, (recognized by the constitution as the creations of legislative power,) these had to be “divided by the general assembly into convenient circuits, each to consist of not less than live, nor more than seven, counties, contiguous to each other,” before a circuit judge could be elected for each of the circuits. Until these two legislative steps had been taken the office of circuit judge sprung not into being, although provided for by the constitution, and is therefore, necessarily, the direct result of constitutional exercise of legislative functions. But when thus in being it was to be filled by the exercise of the same sovereign delegated powers that filled the office of supreme judge, an office that results not from legislation direct or indirect; but is created by the constitution itself. But when the office of circuit judge is thus filled, the officer looks directly to the constitution for the measure of the duration of his office, for its powers, its capacities, its duties, its disabilities, its independence, and its responsibilities. Such also is substantially the result as to the office of judge of the county court and justices of the peace. Nor are all the energies of this system yet aroused and developed, and that its capacities, already so ample, may be still further expanded, to the end that every reasonable desire ol equity and justice may have full scope for gratification, provision is made by the constitution for appropriate additional instru-mentalities. Corporation courts may be erected and vested with such jurisdiction as may be deemed necessary, and, whenever deemed expedient, courts of chancery may be erected. But no provision is made in respect of the offices of those who are to administer justice in these tribunals, other than that general one relating to all offices not “directed” by that instrument, but only authorized to be created whenever the exigencies of the public interest shall seem to demand them, which requires that, before such officers shall- enter upon the duties of their respective offices, they shall take “an oath or affirmation to support the constitution of the United States and of this State, and demean themselves faithfully in office;” and thus, although these offices are the direct offspring of legislation, and much of their very elements and attributes are more of legislative than of constitutional creation, yet, like others in the judicial department not directly created by the constitution, and perceptibly interwoven into-the organic web itself in distinct and well defined colors, those who fill them must, in the same sense that the circuit judge looks to the constitution for his mantle and his chart, also look to that instrument not only for their appropriate place within this system, but also for the confines of their sphere of action as well as for the great features of thoir offices, and for their very soul and life in the aspect of authority. In view, then, of this judicial system, hnd of that entire scheme of our State government, of which it is one department, co-ordinate and co-equal with the legislative and executive, and of our federal organization, regarding all as one harmonious whole, the duty is devolved upon me to determine and declare the effect of the two amendments of our State constitution recently adopted, so far, at least, as they may affect the judges of the circuit courts of this State, who were then in commission, and whose terms of service had not expired. Did these amendments have the effect to oust those judges from office, or are they still the lawful circuit judges for the residue of their constitutional terms of office ? The one amendment is in the following words, to wit: “That the qualified voters of each judicial circuit in the State of Arkansas shall elect their circuit judges.” The other amendment is in these words, to wit: “ That the general assembly of the State of Arkansas shall not be restricted as to the number of counties that shall compose a judicial circuit in this State.” There can be no doubt of the right of the people of this State, at any time, to alter, reform, or abolish, their government in such manner as they may think proper, in whole or in part, and that this right is unqualified save only by the federal constitution, and may be exercised at any and all times — a principle that lays at the foundation of all American governmental institutions, and is so inseparably connected with the idea of both their form and nature that even had it not been found in the second section of the bill of rights, among those “great and essential principles of liberty and free government,” which it was the declared purpose of that instrument to “recognize and unalterably establish,” its existence could never have been questioned by any one at all versed in our history as a people. And there can be as little doubt that amendments, made to the constitution in this constitutional mode, are as much a part of the constitution as if they had been originally incorporated in it, and that they must, necessarily, from the nature of a paramount law, overthrow and abrogate whatever state of things in existence, or laws in force, at the time of their adoption, that may be inconsistent with their instantaneous operation, unless, simultaneous with their adoption, provision be made to restrain or postpone their operation, or unless there be other provisions in the constitution, of which the amendments become a part only, which, either expressly or by fair intendment, have.a like restraining influence, and even as to such all the presumptions of law are in favor of the instantaneous operation of the amendments. To this test I will first subject the amendment which removes from the Legislature all restrictions as to the number of counties to compose a judicial circuit. If there be any provision of the constitution that can, by a possibility, have a restraining influence upon this amendment to overturn the presumption of law in favor of its immediate operation, they can only be found in those provisions in respect of the development of the office of circuit judge, or of the incumbency of that office; for, it being manifest that the office of this amendment is not to resume by the people any power that had been before delegated to the Legislature; but, on the contrary, to confer power in removing limits that had been before fixed to the exercise of legislative power relating to the construction, re-organization, and abolition, of the circuits, and thereby allow more enlarged scope for the exercise of powers in reference to these objects, it necessarily follows that obstacles to the instantaneous operation of this amendment can only be found, if found at all, in matters that touch either the officer or the office of circuit judge; both of which, we have seen, are developed alone by legislation. Can either the one or the other of these interpose any obstacle ? Clearly not: for, besides the consideration that the instantaneous life of this amendment could not, by possibility, in any way, touch the one or the other, until tlie Legislature should, in their discretion, go beyond the bounds of their oid limits; when they should go beyond those bounds they would effect only the identical same end that they could have, before the adoption of the amendment, eñected in another mode, by the use of means already within their power, as has been seen in the glance which I have taken at the whole judicial system, the office, and indirectly the officer, being already within the range of the constitutional powers of the Legislature. For while the constitution, with the one hand, provided the Legislature with the power to create the office, with the other, in a mode as completely within its pale, it gave ample power for its destruction; and, as this amendment does not create, but only allows greater scope for the exertion of these' powers of destruction, which were before complete but restricted to less latitude, there can be nothing found here to overturn the presumption that this amendment must have instantaneous free course; nor will there be found any thing connected with the officer that can have this effect, for if he were even to attempt to set up any proprietary interest or private property in his office as against the public, which I would be slow to regard, he could not pretend to any such beyond the actual existence of his office. And having disposed of this amendment, I will proceed to subject the other to a like test, and determine, if I can, whether it can be held in abeyance. Hut, before I do so, I will endeavor to develope several apposite principles, and make an effort to apply them all before I arrive at my final conclusion. I have remarked that the idea of the instantaneous operation and effect of an amendment of the constitution is inseparably connected with the idea of a paramount law, and that the presumption of law must be always in favor of this construction, and that they must necessarily have such effect, unless this presumption of law is repelled by at least one of the two opposing obstacles I have indicated, and it is not pretended that more than one of these obstacles exists as to the amendment which is now to be considered. And I will here take the occasion to remark that there is an essential difference between the character of this amendment and that which I have just considered. For while that, in effect, took no power from the Legislature, but gave enlarged scope for the exercise of power before delegated to that body, this, on the contrary, in express language and by inevitable necessity, withdraws sovereign powers that had been before delegated and restores them to the people. No one will, for a moment, doubt the correctness of the proposition which I have assumed: that the presumptions of law are always in favor of the immediate operation and effect of the organic law, when applied to a convention of the people assembled for the purpose of remodeling the entire State government; or, for a moment, doubt that the new constitution adopted by such convention would be in force from the moment of its adoption, unless provision should be made in the instrument itself to postpone its operation and effect to a future day. And I will take the occasion here to remark that, so far as my research has ■extended, with all the facilities afforded by the able and industrious counsel, I have found that it has been the uniform course in all the States of this confederacy, not only where the entire State government has been remodelled, but also in cases where mere amendments to the constitution have been adopted, which, like this one, withdraws sovereign powers, or which necessarily disorganizes some part of the existing government, to adopt simultaneously, with such constitution or such new amendment, a schedule, or proviso, to sustain the old state of things, and prevent pro tern, the disrupting influence of the new constitution or amendment. Nor would any one doubt in the case of a convention just put, but that the adoption of the new constitution had abrogated the old one, and dissolved, into its original elements, the government that had been constructed and had existed under its authority. Nor would less doubt arise as to any of these results merely from the fact that no new principle had been incorporated into the new constitution, but the changes made consisted simply in a different combination, or a different application in the new, of all the identical same principles that were found in the old constitution. When this State government was first instituted, certain sovereign powers were delegated and others were reserved, and certain natural rights were surrendered for the common weal, that civil powers and rights might thereby be exerted, grow up, and be preserved. Now it will bo readily admitted that when all the sovereign power's that were delegated shall be resumed, and all the sovereign authority that was bestowed shall be withdrawn, the entire governmental superstructure reared by those powers upon this authority must instantly be destroyed. Can it be less true that where a given sovereign power that was delegated shall be resumed, that the superstructure that was reared upon that particular authority, and by that particular sovereign power, must also be destroyed? Should the people of this State desire to remodel their entire State government, they would, in the exercise of some of the sovereign powers which they have reserved, resume all the sovereign powers that they had delegated, and these, added to those that they had reserved, would place them in the possession of the entire sovereign powers and all their natural rights, except such as have been surrendered and delegated to the federal government, and with these they would! rear a new State government, and delegate to it such powers as they might elect. Now if, in case in this scheme of government, it should be found expressed in the written constitution adopted, that it was “instituted for the peace, safety and happiness of the people,” and there was found no other expression in it, whatsoever, to indicate the time when it should be put into operation, would not this avowal of the objects for which it was instituted be a ground for a strong presumption that it was designed that it should immediately go into effect? And would any one, for a moment, stop and hesitate as to this on the ground that it was a remedial measure, and ought not to be construed to act retrospectively, because there was found “no express words or declaration plain of such intention ?” If any such were found thus to hesitate, and, from this consideration, to argue that it was the intention of the people who adopted this new constitution to postpone its operation until all tbe officers under the government had either died or their terms of office under that old government had expired, it would be necessary, as I think, in order that that objection might be fully answered, to resort to the undoubted principle that the adoption of the new government had, ipso facto, ousted all such officers, because it could be overrode, as I think, by considerations of the same level with the objection, because that rule, as to remedial statutes, can have no reference to organic law, inasmuch as in every case oí its legitimate application* private rights, either natural or civil, are contemplated, and it is designed to guard such from unjust invasion; but, in matters pertaining to organic law, such rights aie not contemplated, otherwise than as altogether subordinate to, if not left entirely out of sight of, the great matter of public and general interest which organic law contemplates. And if the rule could have reference to organic law, and was applied for the purpose of extracting intention, would not all the presumptions that it could raise against the immediate operation of the organic law, be met and overcome by the still stronger presumption in fact that must arise from the expressed great objects of the enactment of the organic law, to wit: the “ peace, safety and happiness of the people;” to which might be added the presumptions that would arise from considering the mischief and the remedy. If then such a presumption of the immediate operation of an entire State government should arise from such an expression found in its constitution, and could not be met and overcome by any presumptions of law, even if applicable, arising from any considerations of the remedial nature of the new government, can it be less true of any amendment that might be subsequently made to a constitution (into which the amendment is written in contemplation of law) in which constitution these very words are found in its most conspicuous part ? Nor would any doubt exist as to whether the old government had expired; nor would the presumption of the immediate operation of the new one, which we have shown to exist, be in any wise repelled from the fact that.the new government exhibited no new principle, but only a different combination or application of the same principles that were exhibited in tbe old one. Although I heartily concur with the chief justice, concurring, as he does, with Judge Story, in this connexion, that the constitution is a practical instrument, designed for the practical purposes of life, to be read and understood by the people, and must not be regarded as the depository of occult mysteries only to be developed by the agency either of the wand of eastern legerdemain, or of abstract and recondite philosophical disquisitions, the very description of which would have to be described, I still entertain the opinion, in which he doubtless concurs with me, that this instrument is not to be put entirely without the pale of the rules of law, when its meaning is to be interpreted by a court of justice. And regarding the constitution and the question before me in that light, I should find in addition to the presumptions of law in favor of its immediate operation, which, I have shown, are inseparable from the idea of a paramount law and to that other presumption that I have shown must arise from the great object for which the government was instituted, so emphatically expressed in the bill of rights, another still stronger presumption, in fact, inevitably arises from considerations touching the mischief and the remedy which never fail to throw some light in a search for intention. If an ordinary statute is to be always so construed as to suppress the mischief and advance the remedy, how much stronger should this general principle be applied to the construction of an organic law, when it is borne in mind that the people can never be considered as having entered upon a work of such vast importance as that of changing their organic law for light and fanciful reasons, but only for those of deliberate and grave import. And when this is considered, would it not be most unnatural to presume that the mischief that they designed to suppress was to be, in effect, the work of future years, and was not to avert evils from themselves or to secure their own rights; and, especially, would not such a presumption appear unnatural in case the term of office, instead of being four years, should be of the duration of good behavior or for life? And yet the principle would be the same, as that would place the people in the extraordinary attitude of doing the grave and weighty work of changing their organic law altogether for the benefit of posterity. Nor could the weight of all these presumptions be, in any manner, overcome by any that could be reared on so slim a basis as any supposed proprietary right or private property in an office, as against the public, or on the rule of law as to the prospective operation of remedial statutes, as I have shown that this rule, contemplating, as it does, private, rights, can have no legitimate application to the construction of organic law; much less any that could be based on any possible distinction between the doing of an act, and at the same time accompanying the act done by a legal exposition of its necessary import, and the doing the same act and leaving the legal exposition of its necessary import to be unerringly spoken by the law: or, in other words, between the doing an act and at the same time performing a work of supererogation in declaring its legal effect and the doing of the same act without doing such work of supererogation. And, therefore, had I no other resource but considerations of this character, to light my way to a conclusion satisfactory to my own mind as to the main question, those which I have touched, but not sought either to enlarge upon or to multiply, would carry me to the conclusion that the true construction of the amendment I am now considering, would be that which would vacate the offices of the circuit judges in this State, unless I could be convinced that the object of the amendment, ratified in 1846, was not only designed for the ordinary operation of the government, but also for extraordinary emergencies, such as this would be, and then I could give my sanction only to the idea that that might possibly keep these judges in office until the new judges should be elected, as provided for by (he act of the last session of the Legislature. But I am not left thus to feel my way to a satisfactory conclusion by dubious lights; but have only to appeal to a great principle, which I have already invoked, but not yet applied; and, to my mind, the light of meridian day is thrown upon my pathway. This State government, with all its machinery, as it existed before the adoption of this amendment, was a superstructure resting upon the constitution. This constitution was not only the foundation, but also the frame-work of the government. And not only was it the foundation and frame-work of the government, but it was itself even some of its more minute and finished parts. And not only was it all this, but it was also the embodiment of all the capacities for the further construction of an entire government, to be progressed in, from time to time, as the exigencies of the public interest might require, until it should be ultimately completed in all its parts. In this unfinished condition, in which it was so partially fashioned by the whole people of the State in their sovereign capacity, it was rested upon their authority which gave it life; and to it they delegated some of their own sovereign powers, to be held and used in trust for themselves. It was first necessary to use these sovereign powers that had been so delegated, in the further fabrication of the government, to fit it for the end designed to be subserved. To do this, such offices as were contemplated, but had not been in fact fashioned out, had to be constructed by means of these delegated powers. Then, by the use of these same powers, these offices had to be filled, for they could be filled by no other powers, as this government had none besides these. So, having been erected by the people, and by the instrumentality of their delegated powers, given life and power by their authority, and armed with their strength, it is their own creation and subject to their sovereign will. By that means it came into being, and by that same will it may be rightfully altered or destroyed. Should it be this sovereign will, at any time, to withdraw this authority, and resume all the powers delegated, the entire government would, instantly, rightfully, and necessarily, come to an end. No living vestige would remain, either in morals or physics, of a great corporation, now so full of life and power. So, should it be, at any time, that will to pull down and re-con struct any one of these departments of the government, leaving the other two untouched, they could rightfully do this; and, instantly, after the work should be done, nothing would remain of what was once the entire judicial department, for instance: the whole having been dissolved and passed into nonentity. And so of a single office within this department: that, for instance, of the office of judge of the supreme court, leaving all else in this department, and in the entire government, untouched. And so of the constitutional tenure of that office, leaving the office untouched. For the constitutional tenure of the office is as much a part of the living organization of the judicial system as the office itself, or any other part of its organization. So also, to my mind, is the appointing, or constituting, the officer as palpably a part of the organical structure of this system. This constitutive feature .of the system was formed, fashioned, constructed, fixed, and authoritively stamped as much as any other fea»ture in the system. It is an efficient authoritive instrumentality: it is an essential, created, artificial material that is woven into the web of the judicial system, and is necessarily a part of its organization. It is much more than form or manner, as whether as a means for the use of this instrumentality ballot or open vote be adopted, and is therefore substance, as whether the appointing power reside in the governor, in the senate, in the legislature, or in the people. It is not natural or incidental: it is artificial, and itself a principal; and a judge, coming in by any other door, was not a part, and could not bo known or have place in, the system. It follows, then, that the annihilation of this feature of the system necessarily works a substantial disruption and delaceration of the living organism as sensible and in the same sense as the annihilation of an office or its tenure, and cuts the connecting link between the judge and the system. How is it that this mighty fabric of government, proudly standing forth like some dome of antiquity, an apparently immortal monument of skill, wisdom, and refinement; full of life, power, and benevolence; and second, in our love and affection, only to Deity himself, can suddenly fall into ruins, even while we gaze upon it ? The reason can be found only in an approximation, or assimilation, to a principle which,'the divines teach us, governs the universe, and presents the true distinction between governmental and private agencies; that the same quantum of true sovereign will and power that spoke the universe into being,has to be continually exerted to keep it in being. Exert this true sovereign will, and withdraw this continuing stay of true sovereign power, and instantly, as “ God said let there be light and there was light,” this so much mightier creation is a lifeless ruin. If the whole governmental organization be subject to this law, can one of its parts claim exemption? Will any one pretendió assert the mathematical absurdity that the part is greater than the whole, or more immortal? Shall the judicial department claim exemption from this law, and stand proudly erect when the executive and legislative departments are in ruins? Shall the judge of the supreme court wear his robes of office and waive the wand of his power, when his office has ceased to exist? Or, shall the judge of the circuit court exercise his functions, when, for want of the continuing sovereign will and power of the people, whereby his life’s blood flowed to him, he has been sloughed off from a judicial system of which, in his official character, he was once a part of its organism? In my opinion, as well might the judges of antiquity rise up, shaking the dust of centuries from their robes of office, and claim a place in our present judicial system on the ground of legal identity. Then, in the light of these views, it is my opinion that all the circuit judges in this State, who were commissioned at the date of the ratification of the amendment to the constitution, that I have been considering, were thereby ousted from office, and that no such official personages, as they claim to be, are now known to the judicial system of this State; and that the judicial system now existing provides for the administration of justice by no other judges than such as shall be constituted by the people of the several circuits. Judges otherwise constituted have no place in the system, and can exercise no authority. And I will remark, in conclusion, although it is perhaps unnecessary, as it is an inevitable sequence from the position I occupy, that it is my opinion that the amendment to the constitution, ratified in 1846, can no more apply to a vacancy created as these have been, than it could apply to a vacancy occasioned by a removal from office by impeachment.